**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

THE UNITED STATES OF AMERICA
ex rel. [UNDER SEAL],

               Plaintiffs,

vs.

[UNDER SEAL],

               Defendants.

INDEX NO.

**FILED IN CAMERA AND UNDER SEAL**
**IN ACCORDANCE WITH THE FALSE**
**CLAIMS ACT 31 U.S.C. § 3730(b)(2)**

**DO NOT PLACE IN PRESS BOX**

**DO NOT ENTER ON PACER**

**JURY TRIAL DEMANDED**

---

**COMPLAINT**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA<br>ex rel. BENJAMIN J. ASHMORE, SR.,<br><br>     Plaintiffs,<br><br>vs.<br><br>CGI GROUP, INC.; CGI FEDERAL, INC.;<br>COLUMBUS METROPOLITAN<br>HOUSING AUTHORITY AND<br>ASSISTED HOUSING SERVICES<br>CORPORATION; TAMPA HOUSING<br>AUTHORITY AND NORTH TAMPA<br>HOUSING DEVELOPMENT<br>CORPORATION; OAKLAND HOUSING<br>AUTHORITY AND CALIFORNIA<br>AFFORDABLE HOUSING<br>INITIATIVES, INC.; NEW YORK STATE<br>HOUSING FINANCE AGENCY AND<br>NEW YORK STATE HOUSING TRUST<br>FUND CORPORATION,<br><br>     Defendants. | INDEX NO.<br><br>**FILED IN CAMERA AND UNDER SEAL**<br>**IN ACCORDANCE WITH THE FALSE**<br>**CLAIMS ACT 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT PLACE IN PRESS BOX**<br><br>**DO NOT ENTER ON PACER**<br><br>**JURY TRIAL DEMANDED** |

---

## **COMPLAINT**

## NATURE OF THE ACTION

1.      Plaintiff-Relator Benjamin J. Ashmore, Sr. ("Relator") brings this action on behalf of the United States to recover hundreds of millions of dollars that Defendants have fraudulently obtained from the federal Government.

2.      This case involves a scheme by CGI Group, Inc., CGI Federal, Inc. (together, "CGI"), and numerous public housing authorities ("PHAs") with whom CGI contracted to defraud the United States by submitting false claims to the U.S. Department of Housing and Urban Development ("HUD") with respect to its Project-Based Section 8 Housing Assistance program. CGI, through its PHA partners, was awarded contracts for HUD's Performance-based Contract Administrator ("PBCA") program around the year 2000 but had its revenue stream threatened when HUD announced it would re-bid the contracts in 2011.

3.      From at least 2010 and through the present day, CGI has conspired with various public housing authorities across the country to submit false bills, false bids, and false protests in a scheme to obtain as much revenue from HUD as possible.

4.      Specifically, CGI and its PHA partners have (1) submitted inflated bills to HUD under contracts that they were awarded prior to the 2011 re-bidding of the PBCA program; (2) submitted false bids to HUD during its 2011 re-bidding process; and (3) lodged false protests when HUD chose other bidders, which has had the intent and effect of delaying to the present day HUD's ability to award its PBCA contracts to entities other than Defendants. As a result, Defendants continue to receive money from HUD under contracts that should have terminated in 2011 when HUD intended to award those contracts to other bidders.

5.      Relator was hired away from his position as a HUD program manager to work at CGI in 2009. After learning of CGI's fraudulent billing practices and plans to evade certain bidding

1

restrictions imposed by HUD during its 2011 re-bidding process, Relator informed senior CGI management that these actions were illegal.  CGI responded by terminating Relator's employment.

6.      Defendants have caused HUD to pay inflated invoices under their PBCA contracts, have corrupted HUD's attempted re-bidding process by submitting false bids, and have stalled HUD's efforts to transfer their PBCA contracts to other entities.  In total, Defendants have obtained hundreds of millions of dollars from the federal Government by means of its conspiracy and submission of false claims.

## I.      JURISDICTION AND VENUE

7.      Jurisdiction is founded upon the Federal False Claims Act, 31 U.S.C. § 3730 *et seq.*, specifically 31 U.S.C. § 3732(a) and (b), and also 28 U.S.C. §§ 1331, 1345.  This Court may exercise personal jurisdiction over Defendants because one or more of the Defendants resides and/or transacts business in this District or committed the proscribed acts in this District.

8.      Venue is properly laid in the Southern District of New York under 32 U.S.C. § 3732(a), in that many of the acts complained of took place in this District and one or more Defendants are located in this District.

## II.      PARTIES

**A.      Plaintiffs**

9.      The United States of America is the real party in interest to the claims forming the basis of this action.

10.      The United States brings this action on behalf of the United States Department of Housing and Urban Development, and its sub-agencies and departments.

2

11.     Relator Benjamin J. Ashmore, Sr. is a citizen of the United States and of the State of New Jersey.  Relator received undergraduate degrees in economics and finance from the University of Michigan.  Relator additionally received a Master of Business Administration degree from the University of Michigan and a Master of Public Policy degree from American University.

12.     In 2004, Relator was appointed to HUD in the role of "Senior Program Manager" with responsibility to manage the Multi-family Asset Management Region II (New York/New Jersey) Hub Portfolio, a part of HUD's Project-Based Section 8 Housing Assistance Program.

13.     In 2009, Relator was hired by CGI Federal, Inc. in the position of "Manager, Consulting and Government Services Delivery."  CGI hired Relator to assist CGI in preparing for the anticipated re-bidding of the PBCA contracts and to pursue other contracting opportunities at HUD.  In the course of his employment with CGI, Relator had regular, direct communications with CGI Federal President George Schindler, Controller Scott Pfost, and CGI Information and Technology Solutions President Donna Morea, and internal discussions with a number of CGI Federal and CGI Group Senior Vice Presidents, Vice Presidents, Directors, and business unit Controllers, and access to documents concerning Defendants' costs, bids submitted and invoices tendered for services and products.

14.     Relator is also a plaintiff in a retaliation action against CGI brought under the whistleblower provisions of the Sarbanes-Oxley Act.

3

**B.    Defendants**

15.    Defendant CGI Group, Inc. ("CGI Group") is a Canadian corporation with its principal offices located in Montreal, Canada and offices in the United States and the State of New York, and is and was at all material times herein doing business and transacting business in the United States and the State of New York.

16.    Defendant CGI Federal, Inc. ("CGI Federal") is a corporation organized and existing under the laws of the State of Delaware, with principal offices located in Fairfax, Virginia and offices in the States of New York, Ohio, California, Florida and the District of Columbia.  It is and was at all times material herein doing business and transacting business in the State of New York.

17.    CGI Federal holds itself out as a wholly-owned subsidiary of CGI Group, and its financial results are included in the financial reports of CGI Group.  To the extent the acts of CGI Federal at issue herein were performed by or otherwise attributable to CGI Group, or any subsidiary or affiliate of it, then judgment should be entered against CGI Group where appropriate.

18.    CGI is listed as 29th on the 2013 Top 100 companies serving the United States government.[1]  CGI states that it is the "5[th] largest independent IT and business process services company" in the world, and earned $ (Canadian) 2,664,876,000 in revenue from its contracts with

---

[1] *See e,g*, "2013 Washington Technology Top 100" ranking based on sales of IT, systems integration, communications, engineering and other high-tech products and services available at http://washingtontechnology.com/toplists/top-100-lists/2013.aspx (last visited May 28, 2015).

Federal and State governments, and private clients in the United States in the year ended September 30, 2014.[2]

19.     Defendant Columbus Metropolitan Housing Authority ("CMHA") is a PHA located in Franklin County, Ohio.  Defendant Assisted Housing Services Corporation ("AHSC") is a wholly-owned subsidiary of CMHA.

20.     Defendant Tampa Housing Authority ("THA") is a PHA located in Tampa, Florida. Defendant North Tampa Housing Development Corporation ("NTHDC") is a wholly-owned subsidiary of THA.

21.     Defendant Oakland Housing Authority ("OHA") is a PHA located in Oakland, California. Defendant California Affordable Housing Initiatives Corporation ("CAHI") is an instrumentality of OHA.

---

[2]  Consolidated Financial Statements of CGI Group for the years ended September 30, 2013 and 2014, at 59; "CGI At A Glance," Brochure, available at
http://www.cgi.com/sites/default/files/brochures/cgi_broc02_letter_cgi_at_a_glance.pdf (last visited May 28, 2015).

Financial analysts have taken note of CGI's unusually high profit margins:

> There are some other oddities in CGI's financials. Its reported profit margins seem high, given the businesses it is in. In its U.S. business, CGI reported an EBITDA (earnings before interest, taxes, and depreciation and amortization) margin of 15 percent in its last fiscal year. But in the past year, 55 percent of CGI's business in the U.S. came from contracts with the federal government and its agencies. Government contracts often operate on a cost-plus basis, meaning that contractors are allowed to earn their costs, plus a little profit. Stanley, which was acquired by CGI in 2010 and which greatly increased the size of CGI's business in the U.S., had an EBITDA margin of 10 percent in the last fiscal year before the acquisition. Since then, there has been pressure on margins, and now, in general, large federal contractors have EBITDA margins below 10 percent. Assume that CGI is more efficient than its peers and has kept a 10 percent margin in the business it does with the U.S. government. Even then, to get to the blended margin of 15 percent that it reports, its nongovernment business would have to have had a 22 percent EBITDA margin, which is sky-high for an information-technology contractor. CGI says that the assumption that its margin on its government work is 10 percent is "incorrect," as is the idea that its government work is predominantly on a cost-plus basis.

McLean, Bethany, *"Accounting for Obamacare: Inside the Company That Built Healthcare.gov,"* Vanity Fair, December 23, 2013, par. 21.

5

22.     Defendant New York State Housing Finance Agency ("NYS-HFA") is a public benefit corporation located in Albany, New York.  Defendant New York State Housing Trust Fund Corporation ("HTFC") is a subsidiary public benefit corporation of NYS-HFA.[3]

23.     The Defendants listed in ¶¶ 19-22 are referred to herein as the "PHA Defendants," and are current contractual recipients of Annual Contributions Contracts ("ACCs") issued by HUD in connection with its PBCA program.   Throughout the relevant time period, these PHA Defendants have subcontracted nearly all of these PBCA duties under their ACCs to CGI Federal.

### III.     THE FALSE CLAIMS ACT

24.     The FCA provides, in pertinent part, that any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C)     conspires to commit a violation of subparagraph (A), (B), ... or (G); [or]

                                        ***

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

---

[3]  In this complaint, "PHA" refers to both public housing authorities and other public benefit corporations that perform similar functions.

31 U.S.C. § 3729(a) (2006), as amended by 31 U.S.C. § 3729(a)(1)(A)-(C), (G) (2010).

25.     The FCA further provides that "knowing" and "knowingly"

(A)     mean that a person, with respect to information-

     (i)     has actual knowledge of the information;

     (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

     (iii)   acts in reckless disregard of the truth or falsity of the information; and

(B)     require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (2010).

26.     An "obligation," as that term is used in 31 U.S.C. § 3729(a)(1)(G), includes "the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

27.     An "overpayment" is defined in the Social Security Act as "any funds that a person receives or retains under subchapter XVIII [Medicare] or XIX [Medicaid] to which the person, after applicable reconciliation, is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).

28.     An overpayment must be "reported and returned" within 60 days after it was identified. 42 U.S.C. § 1320a-7k(d)(2).

29.     Section 3729(a)(1) of the FCA provides that a person is liable to the United States for three times the amount of damages which the Government sustains because of the act of that person, plus civil penalties. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes) and 64 Fed. Reg. 47009, 47104 (1999), the FCA civil penalties were raised to $5,500 to $11,000 for each violation.

## V.   THE HUD PERFORMANCE-BASED CONTRACT ADMINISTRATOR PROGRAM

**A.   Legislative and Administrative Background**

30.     In 1974, Congress amended the 1937 Housing Act to create the Section 8 Housing

("Section 8") program, *see* 42 U.S.C. § 1437f *et seq*; Housing and Community Development Act of

1974, Pub. L. No. 93-383, § 201(a), 88 Stat. 633, 662 (1974) ("1974 Housing Act").

31.     The Section 8 program provides federally-subsidized housing to millions of low-income

families and individuals through several rental assistance programs, both tenant- and project-based.[4]

Under all Section 8 programs, tenants make rental payments to their landlords based on their income

and assets, and HUD then provides, through various delivery mechanisms, "assistance payments" to

the landlords to make up the difference between the tenant's payment and the agreed-upon "contract

rent" between HUD and the landlord.

32.     This case concerns the project-based Section 8 program and the 1974 Housing Act, which

described the proper administration of the Section 8 program as follows:

> (1) The Secretary is authorized to enter into annual contributions contracts with
> public housing agencies pursuant to which such agencies may enter into contracts to
> make assistance payments to owners of existing dwelling units in accordance with
> this section. In areas where no public housing agency has been organized or where
> the Secretary determines that a public housing agency is unable to implement the
> provisions of this section, the Secretary is authorized to enter into such contracts and
> to perform the other functions assigned to a public housing agency by this section.
>
> (2) To the extent of annual contributions authorizations under section 5(c) of this
> Act, the Secretary is authorized to make assistance payments pursuant to contracts
> with owners or prospective owners who agree to construct or substantially
> rehabilitate housing in which some or all of the units shall be available for occupancy
> by lower-income families in accordance with the provisions of this section. The

---

[4] Tenant-based subsidies are portable federal subsidies given to a specific tenant, and they may be used in any rental
property (1) that is not a project-based Section 8 unit, (2) where the project owner agrees to accept the federal subsidy
and (3) that meets various geographical and other criteria.  Project-based Section 8 subsidies are tied to the units in a
project in which HUD and the building owner have agreed to provide federally-subsidized housing, irrespective of the
tenant.

Secretary may also enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners or prospective owners.

33.     The administration of the Section 8 project-based program includes many statutory, rule, and programmatic requirements and tasks for which HUD is responsible to ensure that the landlords with which it contracts, and to which it provides federal subsidies, provide safe, sanitary and decent housing to Section 8 tenant families and individuals.

34.     These required duties are commonly referred to as Housing Assistant Payment ("HAP") contract administration duties.   The portion of payment received by landlords to make up the difference between the tenant payment and the "contract rent" is the HAP.

35.     Through the project-based Section 8 program, HUD currently subsidizes over 1.2 million units of project-based housing for low-income families and individuals.

36.     From its inception in 1974 until 1999, HUD utilized its own network of field offices to perform the HAP contract administration duties in the Section 8 project-based program. *See* United States Government Accountability Office ("GAO") Report 07-290, p. 10.

37.     In 1998, GAO criticized HUD for its "inadequate staff resources to monitor and administer HUD's current array of programs," noting that HUD lacked the necessary resources to manage the project-based developments, or to perform the required HAP contract administration duties. *See* GAO Testimony T-RCED-98-185, pp. 2, 5.

38.     To address these criticisms and resource issues, in its Fiscal Year 2000 Budget Request, HUD requested $209 million to fund a new initiative transferring the contract administration duties of its Section 8 project-based HAP contracts to state and local PHAs organized under state or local law. The transfer would be accomplished through ACCs enabling the PHAs to make HAP payments to owners and serve as performance-based contract administrators – PBCAs – on HUD's behalf.

9

39.     This Budget Request, at 4, specifically noted that HUD "plan[ned] to procure the services of contract administrators to assume many of these specific duties, in order to release HUD staff for those duties that only government can perform and to increase accountability for subsidy payments." The funding of this budget request marked the creation of the PBCA program.

40.     Prior to the creation of the PBCA program, HUD was already contracting with state and local PHAs – through ACCs – to administer its tenant-based Section 8 program, commonly known as the "housing choice voucher" program.

41.     At the inception of the PBCA program, HUD addressed possible PHA profits and the Federal Acquisition Regulation ("FAR")[5] in the context of its new relationship with PHAs:

> Although not technically required to comply with the Federal Acquisition Regulation, HUD stated [in 1999] that it would use a best value trade-off source selection process for evaluating offers similar to the one defined in Federal Acquisition Regulation 15.101-1.
>
> …
>
> In a 1999 memorandum requesting final proposals, HUD further stated, "in general, profit margins exceeding 10% are generally considered to be unacceptable and contracts of this type usually see rates below that amount."

HUD Office of the Inspector General ("HUD-OIG"), Audit Report No.: 2010-LA-0001, pp. 4, 8.

42.     When designing the PBCA program and transferring the contract-administration services to PHAs, HUD made clear that the PBCA program was going to operate as a cost-plus type engagement where PHAs would incur and report their operating costs for performing the tasks of the ACC and be entitled to a reasonable profit – 10% or lower – calculated on the basic administrative fee paid for these operating costs.

---

[5] HUD maintains its own Acquisition Regulations (HUDAR), which prescribes its procurement policies and procedures. *See* "Part 2401 – Federal Acquisition Regulations System," available at http://portal.hud.gov/hudportal/documents/huddoc?id=doc_hudar_01082013.pdf (last visited June 1, 2015).

43.     These ACCs required the PHAs to meet 10 core tasks, within which there were 16 Incentive-Based Performance Standards ("IBPS"), and paid PHAs an administrative fee consisting of basic fees and incentive fees for each of the performance standards or tasks.

44.     The basic fees covered the operating expenses of the PHA for performing as HUD's PBCA and completing the ACC's IBPS tasks.  The basic fees were not to include profits exceeding 10%. *See ante,* ¶ 41.

45.     These fees paid to PHAs varied depending upon (1) the total number of project-based units under administration in each jurisdiction, (2) the sum of the fair-market rents of a specified pool of these units, and (3) the application of various incentive fees or disincentive penalties included in HUD's ACCs.   However, because the number of project-based units has increased in some jurisdictions, and because HUD has steadily increased its approved fair-market rents in all jurisdictions, the annual administrative fees earned by the PHAs have steadily increased from those HUD initially projected and announced at the inception of the PBCA program.  PHAs were and are paid based on monthly invoices submitted to HUD.

46.     IBPS Task 12 required that "[t]he PHA must submit the year-end statement to HUD within 45 days after the end of the PHA's fiscal year" and required PHAs to use HUD Form 52681.

47.     HUD Form 52681 required, *inter alia*, that PHAs report to HUD the actual operating expenses or costs incurred in performing the PBCA duties, from which, if the PHA accurately reported those costs, HUD could assess the profit to the PHA included in the basic fees it paid.

48.     Specifically, HUD Form 52681 includes a certification to be signed on behalf of the PHA that "this voucher for annual contributions has been examined by me and to the best of my knowledge

and belief is true, correct and complete."[6]   The form contains an express warning that HUD will prosecute false claims and statements using the federal False Claims Act.

49.     The ACCs defined "default by PHA" to include "any misrepresentation to HUD of any material fact" and included as a remedy for such default that "HUD may terminate the ACC at any time in whole or in part[.]" Moreover, "HUD's exercise or non-exercise of any right or remedy for PHA default under the ACC is not a waiver of HUD's right to exercise that or any other right or remedy at any time."

**B.      CGI Successfully Enters Into Subcontracting Relationships With PHAs Pursuant To Which It Performs Nearly All The Day-To-Day Duties Of The PHAs In Five Jurisdictions**

50.     In 1999, when it announced that it was creating the PBCA program, HUD initially had difficulty convincing PHAs to take on the PBCA responsibilities of HUD's ACC. Many PHAs were uncertain about the costs and experience necessary to perform those responsibilities. HUD's first of 21 rounds of solicitation and awards only garnered proposals from three statewide PHAs (Massachusetts, Michigan, and South Dakota). Because HUD's ACCs generally conformed to state borders, statewide rather than local PHAs generally had the best institutional capacity to perform as PBCAs.

51.     In HUD's sixth round, Marybeth Carragher ("Carragher"), a public housing consultant then employed by a private-sector company, Orion Consulting ("Orion")[7], created a mechanism (1) to

---

[6] Form HUD 52681, available at http://portal.hud.gov/hudportal/documents/huddoc?id=52681.pdf (last visited May 28, 2015).

[7] Orion Consulting was later acquired by IMR Global in 2000, and IMR Global was acquired by CGI Group in late 2001 or early 2002. CGI Federal was created in 2006 after CGI Group acquired American Management Systems ("AMS") in 2004. *See* Markon, Jerry, and Crites, Alice, "Health-care Web site's lead contractor employs executives from troubled IT company," THE WASHINGTON POST (November 15, 2013). At all times material, Ms. Carragher is and has been employed by a CGI entity or an entity acquired by CGI, and led the private-sector staff responsible for performing PBCA duties.

work around HUD's legal requirement that ACCs could be awarded only to PHAs and (2) to conceal excess profits by making these profits appear to be "operating expenses."

52.      Carragher approached CMHA, an Orion client on other housing consultant engagements, and convinced CMHA that, as a local county PHA, CMHA could seek the Ohio statewide ACC and compensate for CMHA's lack of institutional resources capable of managing a statewide ACC by subcontracting the statewide PBCA duties to Orion, a private sector company with lower costs than CMHA.  CMHA would then share with Orion in the profits that this subcontracting arrangement would generate.

53.      Orion entered into an agreement with CMHA for CMHA to submit a bid that Orion created, to HUD, for the Ohio ACC.  CMHA was successful in this bid to HUD, and did outsource nearly all PBCA duties to Orion.

54.      However, CMHA, as a PHA originally created to operate only in the Columbus, Ohio metropolitan area, lacked authority to operate outside of its chartered jurisdiction.  Thus, prior to submitting the PBCA bid to HUD, Orion and CMHA agreed that, if successful in this bid, CMHA would create a new, wholly-owned instrumentality entity, AHSC, that would provide legal authority to operate outside of CMHA's geographical limitations, perform all statewide PBCA duties of HUD's ACC, and subcontract nearly all of these duties to Orion.

55.      Ultimately, HUD made its initial PBCA awards in 21 rounds.  CMHA was awarded the ACC for Ohio in or about 2000, based upon a bid that contained a cost proposal that certified that the costs proposed were "accurate and allowable."[8]  HUD's announcement of this award disclosed that CMHA's projected annual basic fee would be $12,157,853.

---

[8] *See* HUD-OIG, Audit Report No.: 2010-LA-0001, pp. 9-10 ("The original [1999] request for proposals required applicants to provide a cost proposal that certified that the costs proposed were accurate and allowable.")

56.     NYS-HFA was awarded the ACC for New York in Round 9, in or about 2000, with a projected annual basic fee of $23,071,143.  In 2005, CGI (which by then had acquired Orion and Carragher and her staff) began performing as subcontractor the PBCA duties in New York.  This ACC was also based on a bid that certified that the costs proposed were "accurate and allowable."

57.     Beginning in the 16th round, for the first time, HUD awarded ACCs to out-of-state bidders that had been successful in earlier rounds: in round 16, Mississippi (to Jefferson County [Alabama] Assisted Housing Corporation ("JeffCo")); in round 17, Virginia and Connecticut (to JeffCo); and in round 18, Illinois (to Georgia HAP Administrators).

58.     Thereafter, in or about 2002 or 2003, Carragher duplicated the PHA instrumentality-entity subcontracting model that was successful in Ohio and began performing the PBCA duties of the ACCs in the additional jurisdictions of Florida, northern California and the District of Columbia.

59.     AHSC, the newly created instrumentality entity of CMHA (following Round 6), was awarded the ACC for the District of Columbia in Round 19, with an annual projected basic fee award of $4,809,202.

60.     CAHI, the instrumentality entity of OHA, was awarded the ACC for northern California in Round 19, with an annual projected basic fee award of $13,681,222.

61.     NTHDC, the instrumentality entity of THA, was awarded the ACC for Florida in Round 20, with a projected annual basic fee award of $9,329,322.

62.     HUD's five PBCA jurisdictions of New York, northern California, Ohio, Florida, and the District of Columbia contain approximately 267,000 project-based Section 8 units, about 25% of the units in HUD's nation-wide project-based Section 8 program.  To date, CGI, through its relationships with these defendant PHAs, is still performing the duties of the PBCA in these five jurisdictions as

the incumbent under the original ACCs awarded by HUD at inception of the PBCA program, because

of the bid protests and litigation described in Section VI.D. below.

63.     In these five jurisdictions, defendant PHAs have been paid basic fees for performing the

PBCA duties, based on invoices created by CGI (or its predecessor companies).

64.     In each jurisdiction, CGI and its predecessor companies, through Carragher and her staff,

have performed nearly all of the day-to-day duties as PBCA. CGI refers to this as the "pass-through"

of HUD revenue through the PHA to CGI.  CGI (and earlier, its predecessor companies) performs

upwards of 95% of HUD's ACC IPBS tasks, leaving to their PHA partners only the responsibilities of

(1) communicating with HUD, (2) submitting documentation created by Carragher's team to HUD,

(3) performing limited quality assurance of CGI's work, and (4) managing HUD's annual compliance

review of the PBCA ACC.

## VI.     FACTUAL ALLEGATIONS

**A.     CGI's And Defendant PHAs' Fraudulent Billing Practices Under PBCA Contracts
Prior To HUD's Attempt To Re-Bid The Contracts in 2011**

65.     In the subcontracting model that Carragher conceptualized and implemented, CGI (and its

predecessor companies) added profit margins of approximately 50% onto its actual costs, and then

charged these as fixed costs to the PHA Defendants.

66.     In each jurisdiction, nearly all staff performing the PBCA duties were CGI's staffers,

employed and paid by CGI and its predecessor companies.[9]  Each PHA only contributed

approximately two staffers employed and paid by the PHA.

---

[9]  In the rest of this section of this Complaint, we refer to CGI and its predecessor companies as "CGI" unless
otherwise specified.

67.     The actual costs of performing the IBPS tasks making up the PBCA duties were almost entirely the labor costs of the dozens of staff that CGI employed in each jurisdiction.

68.     CGI has significantly lower labor costs than the defendant PHAs because of (1) economies of scale,[10] (2) lower private-sector salary and benefits compared to PHAs, and (3) the proprietary, internal Contract Administration Tracking System (CATS) software that Carragher's team developed and implemented specifically for the PBCA program.

69.     Carragher added the PHA's costs for its two staffers – essentially the PHA's administrative expenses – onto CGI's fixed costs (actual costs plus the 50% profit) and has represented these combined CGI and PHA costs to HUD as the total operating costs of the ACC in each jurisdiction under administration.

70.     CGI and the PHA Defendants did not disclose to HUD that these operating costs included the 50% profit margin calculated against the costs for all but two of the staffers performing the ACC IBPS tasks in each jurisdiction.

71.     CGI then added another 10% profit calculated against these inflated operating costs to reach the basic fees that the PHA Defendants submitted to HUD for the PBCA ACC duties in northern California, the District of Columbia, Florida, New York and Ohio. However, this 10% profit reported to HUD was neither a 10% profit on total operating costs or expenses, nor even 10% of the PHA Defendants' actual costs.

72.     Because CGI's approximate 50% profit margins were already concealed as operating costs, the PHA Defendants retained the full 10% "profit" reported to HUD. Thus, as the PHA

---

[10]  CGI shares management staff across its jurisdictions, so its per-employee supervision costs (and associated administrative expenses) is substantially lower. Most of the day-to-day work is done by line staff, and here, too, CGI shares line staff, for example, with call centers and is able to use its line staff more efficiently.

Defendants' actual costs for its two staffers were only a small fraction of total costs, this 10% "profit" retained by the PHA Defendants greatly exceeded 10% of the PHAs' actual expenses and was layered onto the concealed profits CGI and its predecessor entities were retaining, making CGI's subcontracting model an exceptionally lucrative arrangement for the non-profit PHA Defendants as well as CGI.[11]

73.     CGI's significantly lower labor costs and concealed profit margins resulted in bid cost proposals, and later monthly invoices, that did not appear to HUD to be out of line with PHAs in other jurisdictions which performed all of the IBPS tasks in-house, without employing subcontractors.

74.     CGI and its PHA partners have also falsely represented to HUD and the public that most of the staff performing ACC IBPS tasks were and are employees of the defendant PHAs or their instrumentality entities, when in fact they were and are employed and paid by CGI.   These false representations have helped the Defendants conceal the inflated profit margins mentioned above.

75.     The monthly invoices that CGI (or its predecessor entities) created and caused to be submitted to HUD by the PHA Defendants, which HUD has paid since in or about early 2000 in the PBCA jurisdictions of northern California, the District of Columbia, Florida, New York and Ohio, constitute false claims against the United States, resulting in more than $600 million in losses to the United States.

---

[11]  PHAs receive their funding from many different federal, state and local sources, and in some cases are responsible for tracking how these different funds are allocated in their financial statements so that the funding entities can ensure that funds allocated are spent legitimately and as authorized.  This often results in PHA program funding shortfalls when poorly-managed PHAs have difficulty providing required services after funding sources have been exhausted. Thus, to the PHA Defendants, these excess profit margins were very desirable to relieve funding pressures in other programs.

**B.     HUD's Decision To Re-Bid All Of Its PBCA Jurisdictions And Defendants' Schemes To Evade HUD's New Restrictions**

76.     In or about 2007 and 2009, the HUD Office of the Inspector General ("OIG") performed several assessments of the PBCA program.  In 2009, the OIG specifically noted that "HUD did not include a mechanism to rebid the [ACC] contracts after a set period" and found that many PBCAs had profits in excess of the amount HUD found acceptable and that these profits were being used for activities that went beyond those of the PBCA program:

> The annual contributions contract states, "the [PBCA] may use or distribute any such earned administrative fee income, including basic fees and incentive fees, for any purpose."  Because the incentive fee was significantly higher than the amount necessary to complete the administrative tasks, many PBCAs had profits in excess of the amount originally determined to be acceptable to HUD.  These profits were not restricted by the contract and were in addition to the profit that was included in the cost proposals.

> We estimate that since inception of the contract, almost $558 million in incentive fees has been paid to the PBCAs.  Our review of 8 of the 53 PBCAs' most recent financial statements disclosed that there was a least $44.4 million in unrestricted funds on the PBCA's books.  In addition, although Congress appropriated these funds for contract administration services, since the excessive funds were unrestricted, they could be used for any purpose.

> We observed many examples in which PBCA organizations used these excess revenues to fund other activities within the organization or returned them to the parent organization's general fund.  One state earmarked the proceeds of this contract to fund community planning and development projects and improve handicapped accessibility in single-family and multifamily dwellings.  Another state used the funds to purchase apartments and "leisure time condominiums." In addition, excess revenues were used to repay millions of dollars for violations cited in Office of Inspector General (OIG) audit findings in which HUD-restricted funds were misused.  In this case, the unrestricted revenues from the PBCA were transferred to the parent organization, a housing agency, to resolve prior violations and close audit recommendations.  Sometimes, the revenue from contract administration activities was not separately identified in the financial statements but was commingled so that the excess revenues were not apparent.

> The contracts produced significantly more profits than those included in the cost proposals.  In turn, these profits provided funding for other activities that were not part of the contract's stated purpose.

18

HUD-OIG Audit Report No.: 2010-LA-0001, pp. 10-11.

77.     As a result of these OIG findings, HUD formally committed to re-competing all of its PBCA jurisdictions in a nationwide re-solicitation.

78.     On January 14, 2010, HUD proposed several restrictions in the re-compete, including a 10% limitation on profits (in the basic and incentive fees combined rather than just the basic fees) and a cap on the total number of units that any PHA or its subcontractor could administer for HUD.

79.     HUD explained that these proposed changes were to "[a]ddress OIG audit findings," including "no cost controls" and "excessive profits" and, with respect to the unit cap, because "a number of PHAs" and "[a] small number of sub-contractors have the capacity to manage more than 300,000 units creating a 'too big to fail' risk to the Department."

80.     At the time that HUD proposed these restrictions, CGI believed that (1) it was the only "nationwide player" planning on "making a major run" at increasing its units under administration in HUD's nationwide re-compete and (2) it could triple the size of its nationwide portfolio. CGI had planned to bid for its existing incumbent jurisdictions – northern California, the District of Columbia, Florida, New York and Ohio – equaling approximately 267,000 units. By January 14, 2010, CGI had already entered into legally binding Memoranda of Understanding ("MOUs") with defendant PHAs and other PHAs in the jurisdictions of Alabama, Arizona, southern California, Delaware, Georgia, Indiana, Kentucky, Maryland, Massachusetts, Michigan, Mississippi, Pennsylvania, Rhode Island, Tennessee, Texas, and West Virginia – more than 600,000 units.

19

81.    These MOUs uniformly contained the following definitions:

- CGI Responsibilities:
  - **Proposal Phase:** Proposal for contract administration services in response to a HUD solicitation.
  - **Start-Up Phase:** Complete start-up of contract administration operation, including Board training, staffing, facilities preparation, technology deployment, file transfer, and all other tasks necessary to successfully complete HUD's Readiness Review for all tasks under the ACC.
  - **Implementation and Operations Phase:** Perform all Performance-Based Contract Administration tasks set forth in the ACC, with the exception of the annual audit and certain quality control and HUD reporting functions.

82.    Upon learning of this proposed 300,000 unit restriction, CGI immediately recognized that it was a huge threat to its expansion plans.  Carragher, a CGI Federal Vice President, emailed CGI Federal President George Schindler, CGI Senior Vice President Richard Schmitz, and other senior executives on January 14, 2010, stating:

> I wanted to bring to your attention some disturbing news... HUD stated that they plan on limiting bids to a combined unit count of 300k per agency.  That's bids, not even awards.  Somebody... asked if that limit includes subcontractors and HUD said yes.  We have 267k units right now, and we are planning on bidding on over 800k units... I think we should all talk asap... [i]t's quite urgent.

83.    The importance and profitability to CGI of this PBCA program – and its plans to expand it – was substantial.  In 2009, the program was generating revenues of almost $60 million a year, more than 10% of CGI Federal's business, with exceptionally high profit margins.  Had the program expanded as planned, it would have grown to almost one-fifth of CGI Federal's business, and generated profit margins far exceeding the 10% HUD permitted and what government contractors generally earned from contracts to perform government duties.

84.    CGI began lobbying to defeat the unit cap and the other proposed restrictions, and CGI initially had confidence that those efforts would prove successful.  Relator participated in these efforts.

20

85.     Privately, however, beginning on or about January 29, 2010, Carragher and other CGI staff began scheming how CGI could deceive HUD and fraudulently evade the proposed unit cap if HUD ultimately implemented it.  In an email on January 29, CGI staff discussed two ways to evade HUD's "monopoly restriction" and "unit restrictions" and also discussed CGI's belief that the 10% profit limitation on PHAs may not be enforceable against CGI as a private company.

86.     Both proposals were designed to conceal from HUD that CGI would effectively be administering units in excess of the proposed unit cap.  The first was for CGI to "hide behind" the PHA's instrumentality entity, which would subcontract 90% of the work to CGI, concealing from HUD that it was doing so, with the PHA representing that it was directly subcontracting only to its instrumentality entity corporation.

87.     The second proposal to evade HUD's unit cap was explained by CGI's Director of Consulting Services Panos Kyprianou to Carragher as a scheme to "create new entities for selected jurisdictions that are a joined venture of PHA and CGI subsidiary.  If this holds then we can get away with the unit restrictions as these entities will be somehow independent from CGI."

88.     CGI initially discussed using these "independent companies" as shell companies with the fundamental purpose of fraudulently evading HUD's unit cap, by falsely representing to HUD that CGI was complying with the unit cap at the bid stage and by concealing from HUD that CGI actually intended to administer many more units, in excess of the unit cap, after the bids were awarded. CGI directors would leave CGI to form separate entities – new "shell" companies – which would subcontract with CGI's PHA partners in CGI's place, but with pre-arranged access to CGI resources, including, without limitation, its proprietary software system created for the PBCA program. After HUD awarded new PBCA ACC contracts, these shell companies (and their directors) would be folded or transferred back into CGI by seemingly legitimate mergers or acquisitions, and CGI would

21

quickly be able to reflect on its books the revenue and market share in the existing and new jurisdictions that CGI was pursuing.

89.     On February 2, 2010, CGI identified another mechanism which could be used to evade HUD's unit cap. If CGI performed only 49% of the PBCA duties for their PHA partners, and the PHAs performed 51% of the PBCA duties, CGI might escape HUD's scrutiny and not be subject to the unit cap in the 30 states it planned on bidding, which, in total, exceeded 900,000 units. One CGI manager wrote, "Since I didn't mention this up front, I want to make sure that you know this contains extremely sensitive information that shouldn't be shared/discussed, even within the RAT Pack team."

90.     The "Rat Pack" was the nickname for the CGI team responsible for managing CGI's re-compete efforts.  Relator was a member of the Rat Pack and was involved in CGI's senior-level planning for the PBCA re-compete until he made SOX objections to CGI's fraudulent scheming.  On May 17, 2010, a few days after he made such objections to Carragher, CGI cut Relator out of these communications.  Less than a month later, CGI hastily terminated him without following CGI's progressive discipline and performance improvement plan policies.  This termination occurred only two months after Relator received a positive annual performance evaluation rating him as meeting expectations in all categories and containing many positive substantive observations about his work.

91.     On May 17, 2010, after cutting Relator out of the senior-level PBCA discussions planning to deal with HUD's proposed unit cap, CGI combined elements of the shell company and 49/51% schemes.  CGI's executives discussed whether their PHA partners would be willing to transfer back to CGI the PHA partners' 51% share of the work, after HUD awarded the bids to those PHA partners. This "transfer-back" concept was approved by CGI executives, and discussed with CGI's PHA partners, at least one of which, Defendant CMHA (and its instrumentality entity AHSC), were apparently amenable to the scheme.

22

92.     After January 14, 2010, and while HUD was considering its proposed unit cap restriction, CGI continued to enter into new MOUs, containing the same CGI responsibilities set forth in ¶ 81 above for New York (to formally extend its incumbent agreement into the re-compete), and for the jurisdictions of Colorado, Connecticut, Illinois, Louisiana, Missouri, North Carolina, South Carolina, and Wisconsin, ultimately obligating CGI to perform nearly all of the PBCA duties in a combination of jurisdictions whose 862,000 units under administration exceeded HUD's proposed unit cap by a more substantial margin than when the cap was initially proposed.

93.     In an email on June 8, 2010, and on a conference call on June 9, 2010, HUD announced that it had decided to implement the proposed unit cap, thus restricting any PHA bidder, or its subcontractor, from administering more than 400,000 units.[12]  This decision was communicated to CGI, which knew HUD's decision was final.

94.     Although CGI had already entered into MOUs binding CGI to do over 90% of the work in a combination of jurisdictions administering 862,000 units – far more than the unit cap – CGI nevertheless entered into another MOU on June 28, 2010, with AHSC, for the state of Virginia, containing the same CGI responsibilities to perform nearly all of the PBCA duties there as well, bringing the nationwide total to approximately 900,000 units for which CGI was planning to do more than 90% of the work.

---

[12] 400,000 units are approximately 33% of HUD's national Section-8 project-based inventory.  At any given time, there was a small fluctuation in that inventory, as some projects exit and enter the Section 8 program.  Initially HUD proposed a 300,000 unit cap but on June 8, 2010 raised it to 400,000 units.

95.     On September 20, 2010, in written questions and answers released to the public, HUD provided the following guidance:

**Q: While it is important in the application process, will the [unit] cap be sustained after the award?**

A: HUD will be incorporating unit limitations into the ACC and will be managing that threshold as part of the requirements of the ACC.

96.     On February 25, 2011, HUD released the formal Invitation for Applications for the national re-compete of the PBCA program. In the Invitation, HUD increased the unit cap to 407,265 units, equaling 33% of the national portfolio of 1,234,135 project-based Section 8 units at that time.

97.     The Invitation prohibited PHAs from submitting bids for a combination of jurisdictions where the PHA was going to perform 50% or more of the PBCA duties in a combination of jurisdictions that, in aggregate, exceeded the 33% unit cap (407,265 units).

98.     The Invitation further prohibited PHAs from subcontracting 50% or more of the PBCA duties to a direct-subcontractor that would be performing 50% or more of the PBCA duties in a combination of jurisdictions that exceeded the 33% unit cap (407,265 units). HUD stated that it would reject all applications from any PHA or direct-subcontractor that submitted bids for a combination of jurisdictions where the PHA or its direct-subcontractor would be performing more than 50% of the PBCA duties in a portfolio of jurisdictions exceeding the unit cap. HUD further required any PHA and its direct-subcontractor, if any, to provide separate certifications with the bids, disclosing the jurisdictions in which the PHA and its direct-subcontractor, if any, would be performing 50% or more of the PBCA duties.

99.     On March 24, 2011, in a question and answer document released to the PBCA industry, HUD stated that "The PHA does not submit its budget or cost estimates or overhead and profit calculations to HUD. It only submits its proposed Basic Administrative Fee Percentage in its

24

Application [unit cap compliance] Certification." In this document, HUD explained how, based on the actual operating expenses, and a reasonable profit – expected at 10% or less – the PHA could calculate the Basic Administrative Fee Percentage being bid to HUD.

100.    In that same document, HUD further clarified what Application Certification it required to evidence compliance with the unit cap. Every PHA bidder had to submit a certification identifying the allocation, between the PHA and its direct-subcontractor[s], of full-time equivalent ("FTEs") staff in each bid jurisdiction. If the PHA certification indicated that any direct-subcontractor was performing more than 50% of the PBCA work in the bid jurisdiction, the direct-subcontractor had to submit a separate certification identifying all jurisdictions in which the direct-subcontractor was, itself, directly performing more than 50% of the PBCA work.

101.    Since HUD would not be receiving any budget or cost estimates or overhead and profit calculations in the 2011 re-compete bids, HUD would have no independent mechanism to determine whether the certifications of the PHAs and direct-subcontractors disclosed accurately their bid staffing plans in compliance with the unit cap limitation.

102.    During the re-compete, HUD permitted potential bidders to submit questions to obtain clarifications about HUD's new restrictions and the implementation of the soon-to-be awarded new ACCs. CGI purposefully refused to ask any questions that would have revealed their fraudulent plans or the size of the portfolio CGI was seeking. CGI also refused to seek any HUD clarifications – including how HUD defined subcontractors – that would have made CGI's fraudulent plans more difficult to carry out. Rather, CGI's Rat Pack discussed whether HUD would require specific reporting of how CGI and its PHA partners were actually performing the work with respect to FTE allocation between them, and whether or how HUD would enforce its unit cap after the new ACCs were awarded.

**C.    Defendants' False Bids In HUD's Nationwide PBCA Re-Bid**

103.    In April 2011, CGI, through its PHA partners, submitted bids to HUD to perform PBCA duties in 26 jurisdictions.  In these bids, CGI certified to HUD that CGI was going to perform 50% or more of the ACC duties in eight PBCA jurisdictions – California, Florida, Illinois, New York, Ohio, Rhode Island, the District of Columbia, and Virgin Islands – equaling 406,978 units, just under the unit cap.  In the other 18 jurisdictions, CGI certified that it was going to perform less than 50% of the ACC duties:  Alabama, Colorado, Connecticut, Georgia, Indiana, Louisiana, Massachusetts, Maryland, Michigan, Missouri, Mississippi, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Wisconsin, West Virginia.

104.    Each of CGI's and its PHA partners' FTE certifications to HUD were false and fraudulent certifications because, in direct violation of the unit cap, CGI planned for, and intended to perform, more than 90% of all FTE roles in all bid PBCA jurisdictions utilizing CGI's own staff even when CGI and its PHA partners certified to HUD that more than 50% of these FTEs would be PHA staff.  Thus, CGI and its PHA partners' bids were also grounded in fraud.

105.    Prior to HUD's implementation of the unit cap on June 8, 2010, *see ante, ¶ 93*, CGI had created all of the financial models – including its own costs and those of its PHA partners, and the allocation of FTEs between CGI and its PHAs.  These models allocated only two FTEs to each jurisdiction's PHA partner, and all remaining staff to CGI.  In all jurisdictions, the combined CGI-PHA staff was projected at approximately 900 FTEs, with CGI contributing more than 90% of those FTEs.

106.    CGI knew the labor costs of its own FTEs.  Other CGI costs included the administrative, real-estate, and support expenses for its labor costs.  For each jurisdiction, CGI then added a profit

margin of approximately 50% onto its actual total costs and provided that sum to its PHA partners as its total fixed cost.

107.    CGI also estimated the labor costs of its PHA partners' two FTEs in each jurisdiction. CGI added those estimated labor costs of its PHA partners to its fixed costs (that included CGI's inflated profits) and, after the ACCs were awarded, planned to certify this sum as the total operating costs of the PHA, to which CGI added 10% for PHA profits. (CGI prepared these annual reporting documents before their bids were submitted). The 10% PHA profit built into the bid certifications in actuality was vastly inflated because it was directly derived from CGI's fraudulently inflated total fixed cost. The PHA was actually layering profits onto CGI's profits because CGI was providing the PHA with fixed costs that included CGI's profits.  Representing these profits as fixed costs and operating expenses in the PHAs' reports to HUD would effectively eviscerate HUD's ability to control costs and profits – thus fraudulently undermining the very purpose of the re-compete.

108.    After HUD implemented the unit cap, on June 8, 2010, CGI continued to plan to perform more than 90% of the FTEs in all bid jurisdictions, in violation of the unit cap.  CGI executives formally approved these fraudulent staffing plans and the concealed inflated profits CGI planned to earn for both itself and its PHA partners and the revenue CGI planned to earn from performing more than 90% of the FTEs in all bid jurisdictions.

109.    Had CGI truly planned to perform 50% or less of the FTEs in 18 of the 26 jurisdictions in which it bid (and certified as much), its revenue and cost models would have had to change, but they did not. CGI's models remained consistent with CGI's contributing upwards of 90% of the FTEs – and performing upwards of 90% of the work – itself.  Similarly, had the PHAs truly planned to contribute 50% or more of the FTEs and to do 50% or more of the work, they would have had to plan

to employ many more people, greatly increase their costs, and therefore receive a much greater share of the revenue. CGI' and its PHA partners' planning never included such projections.

110.    In July 2011, HUD announced the results of the 2011 bids. CGI and the PHA Defendants failed to retain any of their incumbent jurisdictions of northern California, the District of Columbia, Florida, New York, or Ohio. Out of all the jurisdictions in which CGI created bids for submission by its PHA partners, HUD announced that it was awarding ACCs to CGI's PHA partners only in the jurisdictions of Georgia (26,500 units), Michigan (33,900 units) and the Virgin Islands (1,400 units), leaving CGI with only a small fraction of the units it used to administer.

111.    Thereafter, HUD publicly announced the number of bids received in each PBCA jurisdiction (and the Basic Fee Percentage bid in each proposal it received).

112.    Leading up to its 2011 Invitation award announcement, HUD had repeatedly issued short-term contract extensions for all of its original ACCs to prevent any disruption in contract administration and keep incumbent PBCAs in place until such a time that HUD could implement new ACCs.

### D.    Defendants Filed Bid Protests Based On False Bids To Stall HUD's Re-Bid Process And Continue To Collect Revenue From The Government

113.    When so many of CGI's and its PHA partners' 2011 bids were denied, CGI's PHA partners, upon information and belief at the direction and with the assistance of CGI, filed protests of HUD's awards with GAO. Upon information and belief, protests were filed in all jurisdictions in which the defendants were incumbents. In total, GAO received 66 post-award protests in 42 of HUD's PBCA jurisdictions. HUD awarded new ACCs in the 11 unprotested PBCA jurisdictions, including the Virgin Islands, and again extended the original ACCs in all of the protested

28

jurisdictions, including the District of Columbia, California, Florida, New York, and Ohio where CGI and its PHA partners were, and still are, incumbents.

114.     In New York and Ohio, HUD had only received two bids – from CGI and its PHA partner, and one other competitor – and had made the ACC awards to the competitor.  But because of the GAO protest filed by CGI's PHA partner, HUD executed contract extensions to the incumbents – CGI and its PHA partner in both New York and Ohio.

115.     Upon information and belief, CGI and its PHA partners also launched protests regarding the District of Columbia, California, and Florida jurisdictions, in which they were the incumbents. These protests were based on Defendants' false bids and constitute false claims that, along with other protests, resulted in unwarranted extensions of HUD's contracts with Defendants during the protest period.

116.     In April 2014, the HUD Secretary testified that litigation regarding the protests of HUD's PBCA bidding procedures has cost HUD at least $100 million per year, because HUD cannot implement new ACCs.

117.     But for the submission of the 2011 fraudulent bids and fraudulent certifications by CGI and its PHA partners, and their protests of HUD's awards to their competitors, HUD would have removed CGI and its PHA partners as the PBCA in at least the jurisdictions of New York and Ohio, and upon information and belief in the District of Columbia, California and Florida jurisdictions, rather than extend the original ACCs under which defendants still perform the PBCA duties in those jurisdictions.

118.     Rather than litigate at GAO its ACC awards and the bid protests in the 42 jurisdictions, HUD extended the original ACCs in these protested jurisdictions until it could make new ACCs in these 42 jurisdictions, and re-solicited bids in those jurisdictions through a different procurement

process, a Notice of Funding Availability ("NOFA"), characterizing the ACCs as "cooperative agreements" between HUD and the PHAs, and with a different set of restrictions intended to achieve HUD's goal of not permitting any PHA or subcontractor from administering too many nationwide units. Thus, for example, HUD announced that it would not consider any out-of-state PHA bids when it received a qualified in-state PHA bid, which precluded CGI and Defendant AHSC from bidding an out-of-state PHA for the jurisdictions of the District of Columbia, Indiana, Maryland, Rhode Island and Virginia, as they had in 2011.

119.    This time, CGI and its PHA partners filed pre-award protests with the GAO contesting both (1) the NOFA mechanism by which HUD was re-competing the 42 protested jurisdictions, and (2) the new restrictions limiting PHAs and their contractors from becoming too big to fail.

120.    In response to these protests, HUD again extended its original ACC contracts in the 42 jurisdictions, including the five jurisdictions in which CGI and the defendant PHAs were incumbents: Northern California, the District of Columbia, Florida, New York and Ohio.

121.    On April 19, 2013, the Court of Federal Claims rejected these pre-award bid protests. HUD subsequently announced its 2012 NOFA awards, in which CGI and its PHA partners again fared poorly, having been awarded a portfolio of jurisdictions far below the aggregate number of units CGI and its PHA partners were administering as the incumbents from the original ACCs in Northern California, the District of Columbia, Florida, New York and Ohio.

122.    Because of HUD's NOFA restrictions concerning out-of-state applicants, HUD awarded New York to Defendant HTFC, CGI's New York PHA partner in 2012 even though their only competitor, an out-of-state PHA in Ohio, had been awarded New York in 2011, when there were no restrictions concerning out of state applicants. However, but for CGI's and HTFC's 2011 GAO protest, predicated on their fraudulent April 2011 bid and bid certifications, HUD would have

awarded the New York ACC to their competitor in 2011 and they would not have been in a position to be re-awarded the ACC in 2012.

123.    Defendants AHSC, CAHI and NTHDC then appealed to the U.S. Court of Appeals for the Federal Circuit.  Again, HUD extended its original ACC contracts in the 42 protested jurisdictions, including the five in which CGI and its PHA partners were incumbents.

124.    CGI and its PHA partners have continued to reap huge sums from the submission of their fraudulent 2011 bids, bid protests, and the ensuing litigation, and the resulting contract extensions to them as incumbents.  The hundreds of millions of dollars in fees HUD has paid, and continues to pay, to the defendant PHAs (and passed through to CGI) on these original ACCs far exceeds the fees HUD would be paying if it had executed new ACCs in accordance with its bid awards.

125.    For example, when HUD awarded the original ACC for New York, in or around 2000, based on defendant NYS-HFA's[13] certified cost proposal, HUD agreed to pay a basic administrative fee of 2.84%.  At the inception of the PBCA program, HUD projected that this would result in an annual basic fee payment of $23,071,143, as set forth above at ¶ 56.

126.    By April 2011, because of the increase in both fair market rents and the number of units under administration in New York, this fee had ballooned to over $40 million.

127.    However, following the April 2011 Invitation, HUD announced that the two bids it had received in New York (one from CGI and its PHA and the other from a competitor) had proposed basic administrative fees of 1.800% and 1.125% respectively.  Had HUD been able to award the ACC to CGI's competitor, it would have saved the government many millions of dollars.

---

[13] As explained above at ¶ 22, HTFC is a subsidiary entity of NYS-HFA.  While HTFC operates the PBCA program, it was NYS-HFA which submitted the certified cost proposals and bid.

128.   When HTFC submitted a proposal to HUD in the 2012 NOFA, after HUD had disclosed the proposed fees bid in the 2011 Invitation, HTFC unsurprisingly reduced its proposed fee 1.0%.

129.   But for the Defendants' fraudulent bids, bid protests and the ensuing litigation based thereon, HUD could have implemented an ACC resulting from its 2012 NOFA awards in which it would have paid a 1.00% basic fee rather than continuing to pay HTFC the original fee based on 2.84% through extensions of the original contract.

130.   When Defendants obtained their contract extensions from HUD by virtue of their bid protests and their continuing litigation, they well-knew that those extensions were predicated upon their false and fraudulent bids and bid certifications submitted in 2011 and the bid protests which followed.

131.   When Defendants submitted their monthly invoices demanding payment from HUD pursuant to those contract extensions, Defendants well-knew that their April 2011 bids and bids certifications were false and fraudulent, and that, but for their concealment of their false and fraudulent nature, Defendants would have been disqualified and their bids rejected.  Defendants also well-knew that their GAO protests would also have been rejected since, *inter alia*, without a "substantial chance" of being awarded the ACCs they sought, they would have lacked standing to file such protests.

132.   Defendants therefore well-knew, when they submitted their monthly invoices for payment, that their submissions constituted false claims, which have resulted in losses to the United States of more than $300 million since April 2011.

### VII.   CGI'S FALSE OVERHEAD CLAIMS

133.   The fraudulent activities CGI engaged in with respect to HUD's Section 8 PBCA program were by no means inadvertent or confined to that one set of federal contracts.

32

134.     On June 2, 2010, CGI Federal, in partnership with ICF International, responded to The General Services Administration's ("GSA's") request for qualifications under RFQ: GSC-QFOB-10-0009 for a "Business Consulting Services Blanket Purchase Agreement in Support of: The Department of Housing and Urban Development's Transformation Initiative."

135.     Relator was CGI's capture manager for this response, and participated in the oral presentations to GSA for this response as CGI's corporate representative.

136.     GSA required proposers to submit qualifications to perform the general duties of a blanket purchase agreement that GSA estimated at $50 million, together with the actual cost proposals for four initial "sample task orders."

137.     GSA required that bidders provide the bid costs for these sample task orders, calculated on a time and materials basis, in a sealed cost-estimate, identifying (1) key staffers bid in these sample task orders and (2) the billing rates for these key staffers.

138.     While Relator was the CGI capture manager for this proposal process, CGI also bid Relator as a key staffer in the role of "subject matter expert" to provide 756 hours at the contractor site billing rate of $193.66/hour because of his expertise in HUD's Section 8 Housing Choice Voucher Program.  This rate was approved by CGI executives on May 28, 2010 in CGI's internal "Executive Step Review" process and subsequently submitted to GSA in CGI's sealed cost estimate.

139.     The tasks that Relator was bid upon, and the costs for the sample tasks contained in the sealed-cost estimate, were almost all for the business consulting services of staffers employed in CGI's Business Process Services ("BPS") division.

140.     CGI's executives from its BPS division, have insisted in Relator's extant whistleblower litigation, *see ante,* ¶ 14, that Relator's compensation was only $57.27, even though the certified bill-rate for Relator, given to GSA, was $193.66.  In deposition testimony on behalf of CGI in the above

noted litigation, CGI accounting staff member Kelly Bryson could not explain from any internal CGI

policy or rule, or from any government manual, how CGI had apparently arrived at a certified bill-

rate so much greater than Relator's purported actual compensation. Rather, Ms. Bryson repeatedly

testified that it was CGI's practice for CGI's accounting staff to use their "professional discretion" to

blend unrelated labor categories to reach the specific labor categories CGI bid in its June 2, 2010

sealed cost-estimates to GSA.

141. Prior to the May 28, 2010 Executive Step Review, Relator provided Ms. Bryson with the

names of the key staffers being bid by CGI in the sealed cost-estimate. As a part of this process,

Relator participated in conference calls with Ms. Bryson, and other CGI executives, prior to May 28,

when these executives discussed the staffers and computation of the rates to be included in the sealed-

cost estimate.

142. Specifically discussed by Kelly Bryson and CGI Controller Scott Pfost in these conference

calls was that CGI had several overhead pools from which CGI created overhead rates to include in

the time and materials billing rates. These conference calls occurred between CGI staffers located in

different states and involved circulated emails.

143. Although this contract concerned CGI BPS staff, CGI used the overhead rates derived

from CGI's Information Technologies and Information Systems ("ISIT") division. CGI's ISIT

overhead rates are substantially higher than BPS overhead rates.

144. Specifically discussed by CGI staffers, including Pfost and Bryson, was that the BPS

overhead rates had not been formally audited by the government, and that using the ISIT overhead

rates might raise fewer "red flags" because those rates were frequently used by CGI, and had been

accepted by the government in other contracts.

145.    CGI's ISIT overhead rates are self-reported rates derived from CGI's work performed for the Centers for Medicaid and Medicare Services ("CMS").  After CGI submitted its purported summary overhead costs to CMS, CMS approved a "provisional" overhead rate that CGI could use but cautioned that these provisional rates should be used only in bids for contracts substantially similar to the work performed for CMS.

146.    Relator, the capture manager, was never asked about the scope of work in RFQ: GSC-QFOB-10-0009, or for comparison purposes with respect to the scope of work CGI performed for CMS, to determine if the ISIT overhead rates were applicable to this BPS engagement, even though BPS staff, and not ISIT staff, were to perform the specific, bid roles for GSA in this procurement.

147.    CGI submitted its "sealed cost" with the rates described above at ¶ 138 for Relator and others to ICF on or about June 1, 2010, and ICF provided this to GSA on or about June 2, 2010 in the bid ICF submitted to GSA for RFQ GSC-QFOB-10-0009.

148.    GSA did not award RFQ GSC-QFOB-10-0009 to ICF and CGI.  However, upon information and belief, CGI used inflated and impermissible overhead billing rates in other contracts which CGI did win, and perform, as either a direct contractor for the United States or as a subcontractor to another direct contractor.  The invoices submitted for payment on those contracts constitute false claims, which have resulted in losses to the United States of many millions of dollars.

## VIII.   COUNTS

### COUNT I
### FALSE OR FRAUDULENT CLAIMS
**(Against All Defendants)**
**31 U.S.C. § 3729(a)(1)(A)**

149.    Relator hereby incorporates and re-alleges paragraphs 1 through 148 as though fully set forth herein.

150.    Defendants, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the federal Government false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A).

151.    In engaging in the conduct alleged above, Defendants acted "knowingly" as that term is defined in 31 U.S.C. § 3729, in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

152.    As a result of Defendants' violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered damages in an amount to be determined at trial.

**COUNT II**
**FALSE STATEMENTS**
**(Against All Defendants)**
**31 U.S.C. § 3729(a)(1)(B)**

153.    Relator hereby incorporates and re-alleges paragraphs 1 through 148 as though fully set forth herein.

154.    Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to claims for reimbursement to the federal Government in violation of 31 U.S.C. § 3729(a)(1)(B).

155.    In engaging in the conduct alleged above, Defendants acted "knowingly" as that term is defined in 31 U.S.C. § 3729, in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

156.    As a result of Defendants' violations of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered damages in an amount to be determined at trial.

## COUNT III
## CONSPIRACY
### (Against All Defendants)
### 31 U.S.C. §§ 3729(A)(1)(C)

157.    Relator hereby incorporates and re-alleges paragraphs 1 through 148 as though fully set forth herein.

158.    Defendants, by and through their agents, officers, and employees, conspired to commit violations of subparagraph (A), (B), and (G) of the False Claims Act.

159.    As a result of Defendants' violation of 31 U.S.C. § 3729(a)(1)(C), the United States has suffered damages in an amount to be determined at trial.

## COUNT IV
## REVERSE FALSE CLAIMS
### (Against All Defendants)
### 31 U.S.C. §§ 3729(A)(1)(G)

160.    Relator hereby incorporates and re-alleges paragraphs 1 through 148 as though fully set forth herein.

161.    Defendants, by and through their agents, officers, and employees, knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

162.    In engaging in the conduct alleged above, Defendants acted "knowingly" as that term is defined in 31 U.S.C. § 3729, in that they acted with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information.

163.    As a result of Defendants' violation of 31 U.S.C. § 3729(a)(1)(G), the United States has suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

164.    WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in their favor and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This includes three times the amount of damages to the United States plus civil penalties of no more than eleven thousand dollars ($11,000.00) and no less than five thousand five hundred dollars ($5,500.00) for each false claim and any other recoveries or relief provided for under law.

165.    Further, Relator requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.  Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

**IV.    JURY TRIAL DEMANDED**

A jury trial is demanded in this case.

June 3, 2015

J. Douglas Richards (JR6038)

COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
Fax: (212) 838-7745
drichards@cohenmilstein.com

Robert L. Herbst (RLH8851)
HERBST LAW PLLC
420 Lexington Avenue
New York, NY 10170
Telephone:  (646) 543-2354
Fax: (888) 482-4676
rherbst@herbstlawny.com

Jeanne A. Markey
Gary L. Azorsky
Raymond M. Sarola
COHEN MILSTEIN SELLERS & TOLL
PLLC
3 Logan Square, 1717 Arch Street
Suite 3610
Philadelphia, PA 19103
Telephone:  (267) 479-5700
Fax:  (267) 479-5701
jmarkey@cohenmilstein.com
gazorsky@cohenmilstein.com
rsarola@cohenmilstein.com

*Attorneys for Relators*